**UNITED STATES v. TOT.**

No. 7961.

Circuit Court of Appeals, Third Circuit.

Argued July 7, 1942.

Decided Oct. 28, 1942.

Before MARIS and GOODRICH, Circuit Judges, and BARD, District Judge.

GOODRICH, Circuit Judge.

The defendant, Frank Tot, was convicted and sentenced for violation of the statute known as the Federal Firearms Act, 15 U.S.C.A. § 901 et seq., by which it is made unlawful for any person who has been convicted of a crime of violence "to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce * * *."[1] That defendant had been previously convicted of a crime of violence, as defined in the Act, is undisputed. He was arrested by federal officers at his home in Newark, N. J., on a warrant charging theft of cigarettes from an interstate shipment. A .32 caliber Colt Automatic pistol, was found in his place of residence at the time of the arrest, which took place on September 22, 1938. In this appeal the appellant raises several questions of difficulty and importance concerning the statute cited. Additional facts necessary for presentation of the legal questions involved will be made in connection with the question to which they are relevant.

### Search and Seizure.

At various stages of the proceedings after his arrest, appellant made timely motions for the suppression and return of the gun and that any evidence pertaining to it, which had been admitted over his objection, be stricken. All of these motions were denied. Their basis was the appellant's contention that the gun had been obtained in violation of his constitutional guarantee, under the Fourth Amendment, against unreasonable searches and seizures.

Since what the Constitution prohibits is unreasonable search and seizure it is inevitable that the courts are confronted with marginal cases and that sometimes the line between what is held reasonable in one case and unreasonable in another becomes faint. Some searches and seizures incident to a lawful arrest are permitted; others are not.[2] The facts presented here, however, do not show a case close to the line where our result would be indicated

George R. Sommer, of Newark, N. J., for appellant.

Irwin L. Langbein, of Washington, D. C. (Charles M. Phillips, U. S. Atty., of Trenton, N. J., on the brief), for appellee.

---

[1] 15 U.S.C.A. § 902(f).

[2] Cf. United States v. Lefkowitz, 1932, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775, and Go-Bart Importing Company v. United States, 1931, 282 U. S. 344, 51 S.Ct. 153, 75 L.Ed. 374, with Marron v. United States, 1927, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231.

only by a careful analysis and differentiation among authorities by which we are bound. We are not here confronted with the problem of the propriety of the seizure if the officers had found a quantity of cigarettes about the accused's premises and seized them as evidence of his complicity in the crime with which he was charged in the warrant of arrest. Still less are we concerned with the legality of a seizure of some article of contraband like a package of opium or a container of untaxed alcohol. The only article seized here was the gun. Undoubtedly upon Tot's arrest under a valid warrant, as this was, his person could have been searched and the weapon taken from him.[3] The same privilege to search the place where the arrest is made "in order to find and seize things connected with the crime as its fruits * * *, as well as weapons and other things to effect an escape from custody, is not to be doubted."[4]

The serving of the warrant and the taking of the gun by the officers were practically a contemporaneous transaction. The evidence shows that Tot was asked if he had a gun and that he replied in the affirmative. He stated that it was in the pocket of his coat which was hanging in a wardrobe closet in his bedroom. Whether this conversation took place in the kitchen, where the arresting officers entered or the adjoining bedroom, is disputed. We think it does not matter. There was also testimony that Tot offered to get the gun himself and that this unusual offer was declined by the officers, one of whom went to the closet, found the coat, removed the gun and took possession thereof. It might well be said that defendant's offer to produce the gun constituted a consent on his part to its taking by the officers. Regardless of this, however, we think it apparent that the seizure in this case is clearly within the rule stated by the Supreme Court as one not to be doubted under which weapons and other things which may be used to effect an escape from custody may be seized without a search warrant upon a lawful arrest.

 A general search of the premises was made, however, and the only warrant the officers had was the one for the arrest of the accused. If we assume, solely for the purpose of discussion, however, that the search was wider than constitutional limitations permitted, does this invalidate the arrest and the seizure of the weapon which was otherwise lawful as an incident to the arrest? The analogy at once suggested is the ancient doctrine of trespass ab initio by which subsequent misconduct of a party entering under license given by law may render the original entry tortious. Even so, however, this doctrine does not invalidate the doing of an act for the accomplishment of which the privilege exists.[5] Nor is it applicable to criminal prosecutions brought by the United States.[6] Our conclusion is that under the facts of this case the defendant may not complain of violation of constitutional rights in the search and seizure of the gun, and the overruling of his various motions and objections based on this theory were correct.

## Meaning of the Statute.

Appellant's second contention is that the correct construction of the statute does not include the gun which was in his possession at the time of his arrest. In defining the term "firearm" the Congressional language states that it "means any weapon, * * * which is designed to expel a projectile * * * by the action of an explosive and a firearm muffler or firearm silencer, or any part or parts of such weapon."[7]

The pistol here in question was not equipped with a silencer nor is there, according to the testimony of the government's expert, a commercially made silencer for this .32 caliber weapon. It is

---

[3] 4 Am.Juris., Arrest, § 68.

[4] Agnello v. United States, 1925, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145. The Court states that this privilege exists where the arrest is made for a crime committed in the presence of the arresting officers. The latter requirement merely establishes the lawfulness of an arrest without a warrant, as in the Agnello case. When the arrest is made with a warrant, as here, the requirement is unnecessary, for then, the privilege of search and seizure, being incidental to a lawful arrest, is as extensive.

[5] 1 Restatement, Torts (1934) § 214, comment f.

[6] McGuire v. United States, 1927, 273 U.S. 95, 98, 99, 47 S.Ct. 259, 71 L.Ed. 556.

[7] 15 U.S.C.A. § 901(3).

conceded, however, that a silencer could be made for it and there is evidence of a demonstration of the successful fitting and operation of a made-over .25 silencer on a gun of the same make, model and caliber. The appellant's argument is that the plain words of the statute, in which the conjunctive "and" is used instead of the disjunctive "or" or a combination of the two, limits the application of the statute to guns which are provided with a silencer, or where one may readily be applied. This being the plain meaning, he says, and the statute a penal one, resort should not be had to extrinsic sources like Treasury Regulations or legislative debates and hearings to give it some other meaning.

If the premise of plain meaning were acceptable, there is something to be said for the suggested conclusion. We do not agree with the appellant's argument about the plain meaning. The statute as a whole indicates an ambitious plan for dealing with firearms in interstate commerce. The very sentence upon which appellant relies shows, in the last phrase, the intent of Congress to deal with the parts as well as the whole. The appellant's interpretation of the language requires the word "and" to be read as "combined with". This, it seems to us, is quite a jump from plain meaning. It is a much narrower construction than we believe Congress meant in view of the statute as a whole and the concluding clause of the sentence referred to.

That Congress had no such narrow limitation in mind is clear from the discussion of the statute prior to its passage. Both the proponents and opponents of the Act thought of its provisions in the broadest terms, applicable to a "gun of any type", "firearms of all kinds", etc. [8] This reference is not made to put in the statute something which is not there. But, it is a matter for consideration in determining what the scope was of the problem the legislature had in mind. [9]

■ There is an additional point of administrative regulation also. Section 903 of the Act relates to licensing of manufacturers of and dealers in firearms and this is committed to the Treasury. Regulations were issued under which the clauses were rearranged and numbered to make explicit the disjunctive relation of the gun and the silencer. [10] The Congress subsequently amended the definition of ammunition in the very same statute. [11] The opportunity was then present to modify the firearms definition if the Congress had considered that the administrative officers had carried it beyond it original meaning. We think this is a case where what the Treasury had evidenced as being its understanding of the meaning of the statute, "Congress impliedly confirmed as being correctly interpretative of the legislative intent." [12] Our conclusion upon this point is that the pistol here in question was within the definition of firearms given in the statute.

---

[8] Hearings before Senate Committee on Commerce on S. 3. 74th Cong., 1st Sess. (1935) 10, 13, 15, 44; Hearings before H. R. Subcommittee of the Committee on Interstate and Foreign Commerce on S. 3, 75th Cong., 1st Sess. (1937) 4, 5, 18. Sen. Rep. No. 997, 74th Cong., 1st Sess. (1935) 1; Sen. Rep. No. 82, 75th Cong. 1st Sess. (1937) 1.

[9] It is also noteworthy, that the first two drafts of this section interposed a semi-colon between "explosive" and "and". See text as it appears in Senate Hearings, supra at pp. 1, 2 and in 79 Cong. Rec. 11973, 11974 (1935). The semi-colon was absent in the third draft which was sent without further amendment to the House. See H.R.Hearings, supra, at pp. 1-3. The Senate Report on the third draft states that the only change from prior drafts in the bill appears in a section, other than the one under consideration. See Sen. Rep.No. 82, supra, H.R.Hearings, supra, at p. 13. This legislative history indicates that the omission of the semi-colon

in the final draft was unintentional. With that punctuation mark, it is clear that the statute meant guns with or without silencers as is otherwise apparent from the Hearings, supra.

[10] "The term 'firearm' means (1) any weapon, by whatever name known, which is designed to expel a projectile or projectiles by action of an explosive, (2) any part or parts of such weapon, and (3) a firearm muffler or firearm silencer." 26 Code Fed.Regs., 1939 Supp. (1940) § 313.-1(b).

[11] August 6, 1939, 15 U.S.C.A. § 901(8).

[12] Aluminum Co. of America v. United States, 3 Cir., 1941, 123 F.2d 615, 620. The Regulation does not, on the facts here, gain authority from its long standing character. It became effective May 1, 1939. The statutory amendment came in August of the same year. But the subject matter of the statute, and obviously especially the definitional provisions, were before Congress during the dates mentioned.

## The Second Amendment.

The Second Amendment to the Constitution of the United States provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

The appellant's contention is that if the statute under which this prosecution was brought is to be applied to a weapon of the type he had in his possession, then the statute violates the Second Amendment.

■ It is abundantly clear both from the discussions of this amendment contemporaneous with its proposal and adoption and those of learned writers since [13] that this amendment, unlike those providing for protection of free speech and freedom of religion, was not adopted with individual rights in mind, but as a protection for the States in the maintenance of their militia organizations against possible encroachments by the federal power.[14] The experiences in England under James II of an armed royal force quartered upon a defenseless citizenry [15] was fresh in the minds of the Colonists. They wanted no repetition of that experience in their newly formed government. The almost uniform course of decision in this country,[16] where provisions similar in language are found in many of the State Constitutions, bears out this concept of the constitutional guarantee. A notable instance is the refusal to extend its application to weapons thought incapable of military use.

■ The contention of the appellant in this case could, we think, be denied without more under the authority of United States v. Miller, 1939, 307 U.S. 174, 59 S. Ct. 816, 83 L.Ed. 1206. This was a prosecution under the National Firearms Act of 1934 and the weapon, the possession of which had occasioned the prosecution of the accused, was a shotgun of less than 18 inch barrel. The Court said that in the absence of evidence tending to show that possession of such a gun at the time has some reasonable relationship to the preservation or efficiency of a well regulated militia, it could not be said that the Second Amendment guarantees the right to keep such an instrument. The appellant here having failed to show such a relationship, the same thing may be said as applied to the pistol found in his possession. It is not material on this point that the 1934 statute was bottomed on the taxing power while the statute in question here was based on a regulation of interstate commerce.

■ But, further, the same result is definitely indicated on a broader ground and on this we should prefer to rest the matter. Weapon bearing was never treated as anything like an absolute right by the common law. It was regulated by statute as to time and place as far back as the Statute of Northampton in 1328 and on many occasions since.[17] The decisions under the State Constitutions show the upholding of regulations prohibiting the carrying of concealed weapons, prohibiting persons from going armed in certain public places and other restrictions, in the nature of police regulations, but which do not go so far as substantially to interfere with the public interest protected by the constitutional mandates.[18] The Federal statute here involved is one of that general type. One could hardly argue seriously that a limitation upon the privilege of possessing weapons was unconstitutional when applied to a mental patient of the maniac type. The same would be true if the possessor were a child of immature years. In the situation at bar Congress has prohibited the receipt of weapons from interstate transactions by persons who have previously, by due process of law, been shown to be aggressors against society.[19] Such a classification is entirely reasonable and does not

---

[13] 1 Elliot's Debates on the Federal Constitution (2d Ed. 1901) 371, 372 (Luther Martin's letter to the Maryland Legislature); 4 id. 203 (Lenoir, North Carolina Convention); 5 id. 445 (Sherman of Connecticut at the Federal Convention). Emery, The Constitutional Right to Keep and Bear Arms (1915) 28 Harv.L.Rev. 473; Haight, The Right to Keep and Bear Arms (1941) 2 Bill of Rights Rev. 31; McKenna, The Right to Keep and Bear Arms (1928) 12 Marq.L.Rev. 138.

[14] As to the latter, see The Federalist, Nos. XXIV-XXIX and No. XLVI.

[15] See Aymette v. State, 1840, 2 Humph. 154, 21 Tenn. 154; also law review articles in f.n. 13.

[16] See Haight, supra and McKenna, supra.

[17] See Emery, supra, at pp. 473, 474.

[18] See f.n. 16.

[19] The statute is applicable to anyone who has been convicted of a crime of violence which is defined as "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with in-

infringe upon the preservation of the well regulated militia protected by the Second Amendment.

## Refusal of Directed Verdict and Request for Charge.

The questions raised by the appellant under this heading may be considered together. The alleged error in refusal to dismiss the indictment or to direct a verdict relates, so far as this point goes, to the matter of the government's proof and the charge which was requested and refused concerns the same matter. The statute which makes it unlawful for any person who has been convicted of a crime of violence to receive a firearm which has been shipped in interstate commerce provides that "the possession of a firearm * * * by any such person shall be presumptive evidence that such firearm * * * was shipped or transported or received * * * by such person in violation of this chapter." § 902(f). The prosecution showed possession of the weapon already described [20] by the defendant at a date when the statute was in effect. Proof of prior conviction of a crime of violence was also shown. The prosecution then rested. The defendant introduced testimony by himself, his wife and his sister tending to show continuous possession of the gun from a date several years prior to the passage of the statute. Rebuttal testimony for the prosecution was confined to one witness, employed by the manufacturers of the gun, who showed its shipment in 1919 from the factory in Connecticut to a business firm in Illinois. The defendant by a timely motion asked for a directed verdict and a dismissal of the indictment on the theory that having offered evidence to show his possession prior to the effective date of the statute the presumption created by the statute disappeared and in the absence of additional evidence against that offered by him, he was entitled to have his motions granted. He backs that up with words from Wigmore to the effect that a presumption is merely to invoke a rule of law compelling the jury to reach a conclusion in the absence of evidence to the contrary, and if such evidence is offered, the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule.[21] In addition the appellant cites one State decision which seems squarely to apply the rule as he would have it.[22]

■■ We think the answer to the appellant's point here is completely stated in the words of Professor Bohlen in "The Effect of Rebuttable Presumptions of Law Upon the Burden of Proof":[23] "It is the duty of him against whom any presumption operates to produce evidence, not merely witnesses, and therefore he must satisfy the jury of the credibility of his witnesses." Simply causing words to be uttered is not enough. The two women witnesses offered by the defendant distinctly faltered in the certainty of their identification of the weapon made so readily upon direct examination.[24] Defendant stuck to his story, but it had some ele-

---

tent to commit any offense punishable by imprisonment for more than one year." § 901(6).

[20] The instrument itself was in evidence as a government exhibit.

[21] 9 Wigmore on Evidence (3rd Ed. 1940) § 2941.

[22] McIver v. Schwartz, 1929, 50 R.I. 68, 145 A. 101 but contra see O'Dea v. Amodeo, 1934, 118 Conn. 58, 170 A. 486 and see the adverse comment on the McIver case by Morgan in Instructing the Jury Upon Presumptions and Burden of Proof (1933) 47 Harv.L.Rev. 59, 78-81; Some Observations Concerning Presumptions (1931) 44 Harv.L.Rev. 906, 912-913.

[23] (1920) 68 U. of Pa.L.Rev. 307, 315 f.n. 13.

[24] On cross-examination:
Appellant's wife:
"Q. You are not an expert on guns? A No."
* * * * *

"Q. Are you able to tell us definitely and certainly the way you appeared to tell us on direct examination, Mrs. Tot, that it was this gun that your husband had rather than some gun of the same make and calibre, general appearance or what not? A. Well, I cannot tell you definitely, but it was one like it.

"Q. It was one like it. It might have been some other gun? A. Well, I don't know guns, one from the other.

"Q. I see. All you are able to tell us. is that your husband Frank Tot had a gun. A. Yes, sir."
* * * * *
"Q. And you are unable to tell us even roughly, I take it, how many times all told you saw the gun? A. No."
Appellant's sister:
"Q. Are you a gun expert? A. Oh, I should say not.

"Q. Then I take it you don't know either whether this is really the same gun that you say you saw? A. Well, it re-

ments which certainly made a basis for doubting its truthfulness even without reference to his previous criminal record. We think the most the defendant was entitled to have was a fair submission of the question to the jury. And this, as will be pointed out presently, was given. The constitutionality of presumptions more difficult to rebut than the one here involved has been sustained by the Supreme Court.[25]

Defendant asked an instruction, which was refused, "That such presumption is never evidence and if you find that this presumption has been repelled by the evidence you must acquit." The presumption referred to is that in the statute already quoted.

To give the instruction in the language asked for by the defendant would have been confusing to the jury. Statutory language is to the effect that possession of the weapon is presumptive evidence of violation. For the court, after having quoted the statute, to tell the jury that such presumption is not evidence would certainly have not tended to clarity in their minds. But the learned judge did much more than refuse an instruction which would have caused confusion. His charge on the point was clear and helpful. He told the jury at least twice that the burden was on the United States to establish defendant's guilt beyond a reasonable doubt and told them, too, that the burden did not shift. He left it to the jury to find whether the defendant obtained the gun subsequent to June 30, 1938 and emphasized to them that they were the sole judges of the facts concerning this statement especially as to the testimony offered by the defendant. Then he repeated the ultimate issue in the final paragraph of his charge. We think this left the matter clearly to the jury in a way in which they could understand and gave the defendant the full benefit of the testimony of his witnesses if that testimony was to be believed. More than this he cannot ask.

### Constitutionality of the Statutory Presumption.

By far the most difficult problem in this case is the constitutionality of a presumption created in § 902(f). After declaring it unlawful for any person convicted of a crime of violence to receive any firearm in interstate or foreign commerce, the provision is that the possession of a firearm by such person shall be presumptive evidence that such firearm was received by such person in violation of the chapter.[26] The appellant did not press this point in his main brief or oral argument, though he discusses that portion of the government's argument in his reply brief. Nevertheless, because this is the first time the statute has been before an appellate court for consideration we think that fairness to the accused requires consideration of this problem as well as the other points already discussed.

The obvious offhand response to such presumption in a criminal statute is that it violates the fundamental concept that a man is innocent until proved guilty by putting on him the burden of producing the facts which establish his innocence.

---

minded me of a water pistol; that is why I know it.

"Q. I take it—A. I don't mean I know it, but the name on it.

"Q. The name Colt? A. That's right.

"Q. You know your brother had a Colt gun, is that it? A. That's right."

\* \* \* \* \*

"Q. Then, what you know is that your brother used to have a Colt gun that looked like a water pistol? A. One of those things just like you have in your hand."

\* \* \* \* \*

"Q. You would see the gun in the drawer? A. That's right.

"Q. Or to be more precise, you would see a gun in the drawer, right? A. Of course, a gun."

[25] Yee Hem v. United States, 1925, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904 (Jones-Miller Act, 21 U.S.C.A. § 174.

"\* \* \* such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury"); Hawes v. State of Georgia, 1922, 258 U.S. 1, 42 S.Ct. 204, 66 L.Ed. 431. State statute which provided that distilling apparatus found upon land shall be prima facie evidence that the person in possession of the premises had knowledge of the existence thereof, held constitutional, although defendant was not allowed to testify under oath or to have the testimony of his wife; Fong Ye Ting v. United States, 1893, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905, Chinese found in United States without prescribed evidence as to lawful residence to be deemed to be unlawfully in United States unless each establishes by one credible white witness facts to the contrary.

[26] 15 U.S.C.A. § 901 et seq.

Such a sweeping objection comes many years too late.[27] Mr. Justice Lurton, speaking for the Supreme Court in Mobile, J. & K. C. R. R. v. Turnipseed, 1910, 219 U.S. 35, 43, 31 S.Ct. 136, 138, 55 L.Ed. 78, 32 L.R.A.,N.S., 226, Ann.Cas.1912A, 463, stated a test that has many times been repeated, "That a legislative presumption of one fact from evidence of another may not constitute a denial of due process * * * [if there is] some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate." This test was approved and applied fifteen years later to uphold a criminal prosecution under a statutory presumption in the Harrison Narcotics Act, 38 Stat. 785; Yee Hem v. United States, 1925, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904. More recently, the late Mr. Justice Cardozo, speaking for the Court in Morrison v. California, 1934, 291 U.S. 82, 88, 54 S.Ct. 281, 284, 78 L.Ed. 664, states the testament somewhat more broadly. "The decisions are manifold that within limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant. The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression."

The problem, therefore, becomes much narrower than at first appears, in view of the test of the constitutionality above set out. So far as the application to the facts of this case are concerned, we think the considerations show that the presumption is constitutional as applied to an interstate commerce shipment whether the more limited formula of the Turnipseed case or the broader generalization found in the Morrison case is followed. The gun in question certainly had two interstate journeys because it was proved that it was originally shipped from Connecticut to Illinois and it was found in the defendant's possession in New Jersey. Acquisition in New Jersey under the New Jersey law, would not have been easy. New Jersey, in common with many other States,[28] has rather stringent regulations surrounding the transfer of firearms of this type. The tendency is to require such transfers to be open, to make them more difficult and certainly to put obstacles in the way of acquisition by persons of criminal records like that of the defendant.

Furthermore, Congress had, when the Federal Firearms Act was under consideration, evidence dealing with the interstate activity of armed law breakers.[29] In determining the constitutionality of the legislative solution of a problem courts are not to ignore the existence of such facts before legislative bodies even though the evidence of those facts is not part of the record in a particular case. United States v. Carolene Products Co., 1938, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234. We think these considerations are sufficient to protect the statute created presumption from the charge of arbitrariness.

The scholarly counsel for the government presented another basis on which the presumption might be upheld. It is based upon the decision in Ferry v. Ramsey, 1928, 277 U.S. 88, 48 S.Ct. 443, 72 L.Ed. 796. There the Supreme Court upheld the constitutionality of a statute imposing civil liability upon a bank director for assenting to the receipt of deposits after knowledge of insolvency of the bank adding a presumption of knowledge of insolvency and assent to receipt where deposits were so received. Through Mr. Justice Holmes the majority of the Court recognized that the legislature had power to impose the liability regardless of knowledge. That be-

---

[27] See note, Statutory Presumptions and Due Process of Law (1929) 43 Harv.L. Rev. 100.

[28] For a collection of State regulations, see 3 Prentice-Hall 1942, Fed. Tax. Serv. Par. 31502. For New Jersey specifically, see N.J.Rev.Stat. (1937) 2:176–3, 4, 5, 8, 33, 44, N.J.S.A. 2:176–3, 4, 5, 8, 33, 44.

[29] 1 Hearings before Senate Subcommittee of the Committee on Commerce, pursuant to S. Res. 74, 73rd Cong., 2nd Sess. (1933) 9. The Federal Firearms Act was partly the result of the evidence adduced at these hearings authorized by S. Res. 74, entitled: A Resolution Authorizing an Investigation of the Matter of So-called "Rackets" with a View to Their Suppression. See S.Hearings, supra, f.n. 8 pp. 1, 19 and H.R.Hearings, supra, f.n. 8 pp. 3, 4.

270

ing so, to do something less, in terms of a statutory presumption, is not unconstitutional. On that foundation the argument is made that Congress, under the commerce clause, could have made it a substantive crime for persons with records like that of the defendant to possess guns upon the theory that criminals with guns are the kind most likely to engage in interstate journeys.[30] The argument then concludes that if possession itself could have been penalized under the interstate commerce power, a statutory presumption of interstate shipment, however inept a way of reaching the same result, is not unconstitutional. This may be sound. We do not deem it necessary to go so far in this case. As stated above, we believe the presumption of interstate shipment can be sustained under orthodox formulae many times enunciated.

■ We now come to the last question, that of the application of the statutory presumption as to the time of the acquisition of the weapon found in the possession of the defendant. The statute became effective July 30, 1938. § 906. The trial judge's instruction told the jury that the presumption was that the gun was shipped in interstate commerce if the jury found defendant obtained it subsequent to June 30, 1938.[31] The only direct evidence bearing on time of acquisition was that given by the defendant and his wife and sister. This testimony the jury evidently disbelieved as shown by its verdict of guilty. But without positive testimony by the government showing the time of acquisition the verdict cannot stand unless the statutory presumption applies both to the interstate commerce nature of the transaction and to the time thereof. If it does the defendant has no ground for complaint by reason of the jury's failure to follow the trial judge's instruction.

■ We have no doubt that the possession of the firearm by one of the class of persons designated in the statute is intended to be treated as presumptive evidence both of the fact of interstate shipment and the time of receipt by such person. The words used quite evidently relate to the whole statute. "* * * possession * * * shall be presumptive evidence that such firearm * * * was shipped * * * or received, * * * by such person in violation of this chapter." § 902(f). The chapter is the whole statute including § 906 which provides for its effective date and ending with § 909 giving its short title.[32] White v. United States,[33] a case under the importation section of the Harrison Narcotics Act, is an authority in point in the application of the "presumptive" evidence provision to the time element.

Can presumption of acquisition in violation of the law be constitutionally applied? The government frankly admits that tested alone by the rational connection[34] between the fact proved and the fact presumed, presumption is indefensible. The evidence showed that the gun was shipped by its manufacturer in 1919 and that Tot was arrested and the weapon seized in September, 1938. The likelihood that he acquired it in the short time between the effective date of the statute and the date of his arrest is admittedly slight.

But on the question of opportunities for knowledge mentioned in the phrasing of the test by Mr. Justice Cardozo, in the Morrison case, cited above, there is much more to be said. A man in possession of the gun is certainly in a position to know better than anybody else, when he got it.

30 See S. Hearings on "Rackets" supra, f.n. 29, v. 1, pt. 2, pp. 220, 261, pt. 3, pp. 276, 354. See also, Department of Commerce, Bureau of the Census, The Prisoner's Antecedents (1929) p. 12, table 5, and pp. 54-57, table 36, showing the tendency of criminals to roam, specifically indicating the correlation between gun offenders and nonresidency in the state where the offenses were committed.

31 The statute was enacted June 30, 1938, but became effective by its terms, 30 days thereafter. The instruction was therefore incorrect in placing emphasis on the June 30 date. As we view the case, however, this was harmless error.

There was no evidence whatever indicating acquisition of the weapon between June 30 and July 30. If the defendant's evidence was to be believed, he had acquired the gun years before.

32 One section of the statute (§ 904) expressly deals with exceptions. Certain persons are excepted and so also, certain firearms; these are those which are "antique or unserviceable." This case is not concerned with them.

33 9 Cir., 1926, 16 F.2d 870, certiorari denied, 1927, 274 U.S. 745, 47 S.Ct. 660, 71 L.Ed. 1326.

34 As stated in the Turnipseed case, supra.

The statute does not, as warned against in the Turnipseed case, at page 43 of 219 U. S., at page 138 of 31 S.Ct., 55 L.Ed. 78, 32 L.R.A.,N.S., 226, Ann.Cas.1912A, 463, "operate to preclude the party from the right to present his defense to the main fact thus presumed". The defendant in this case did present his evidence. It would clearly, if believed, have established possession long before the statute was passed. That the trier of the fact will not believe one's story is a risk common to all litigants, although it may be granted that it bore particularly hard upon Tot, whose previous criminal record was already in the case. It must be borne in mind that the legislation here is not sweeping in its scope as directed against all citizens in the possession of inherently innocent objects. It is dealing with firearms. And it is directed only at that narrow group which has already been convicted of crimes of violence.

■ This question may be approached from another angle to reach the same result. That the legislature in accomplishing an admittedly lawful and constitutional object may protect the result sought by a means which when considered by themselves might be unconstitutional is well established. Mr. Justice Holmes states the point in characteristic epigram: "* * * the law allows a penumbra to be embraced that goes beyond the outline of its object in order that the object may be secured." [35] The concept is no stronger or no weaker by calling it the penumbra doctrine.[36] There are numerous instances of this power. Thus a statute which forbids the removal of original marks from imported merchandise is constitutional, even after the latter have come to rest in a State, as one reasonably calculated to render effective the principal requirement that the goods bear a mark at the time of importation. United States v. Ury, 2 Cir., 1939, 106 F.2d 28, 124 A.L.R. 569. A State statute forbidding the possession of game during the closed season is constitutional even if applied to game taken elsewhere and brought into the State. Silz v. Hesterberg, 1908, 211 U.S. 31, 29 S.Ct. 10, 53 L.Ed. 75. Regulations requiring certain labeling of denatured alcohol, unsuitable as a beverage, were upheld within the power of Congress under the Eighteenth Amendment. Selzman v. United States, 1925, 268 U.S. 466, 45 S.Ct. 574, 69 L.Ed. 1054. So, too, forbidding the prescribing of intoxicating malt liquors for medicinal purposes was upheld as an aid to prohibition enforcement. Everard's Breweries v. Day, 1924, 265 U.S. 545, 44 S.Ct. 628, 68 L.Ed. 1174. Likewise, the forfeiture of empty barrels, bottles, corks and cartons was sustained. Danovitz v. United States, 1930, 281 U.S. 389, 50 S.Ct. 344, 74 L.Ed. 923. The list, which does not pretend to be exhaustive, may be closed with reference to United States v. Darby, 1941, 312 U.S. 100, 657, 61 S.Ct. 451, 462, 85 L.Ed. 609, 132 A.L.R. 1430, a case under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. where the Court said "* * * Congress * * * may require the employer, as a means of enforcing the valid law, to keep a record showing whether he has in fact complied with it. The requirement for records even of intrastate transactions is an appropriate means of the legitimate end."

■ The social end sought to be achieved by this legislation, the protection of society against violent men armed with dangerous weapons, all would concede to be fundamental in organized government. The entry of the federal authority in the field to help accomplish this purpose has not been challenged. It has been taken for granted by both sides in the discussion of this case. We also think it may be assumed. In accomplishing the admittedly constitutional object we do not think the means taken by this statute, while stringent, have become so oppressive and arbitrary that we are entitled to say that Congress has exceeded its authority in acting without due process of law.

The judgment is affirmed.

---

[35] Schlesinger v. Wisconsin, 1926, 270 U.S. 230, 241, 46 S.Ct. 260, 262, 70 L. Ed. 557, 43 A.L.R. 1224. The quotation is from the dissenting opinion. The presumption under consideration in that case was a so-called "conclusive presumption" which, of course, presents quite a different problem from the one under consideration here.

[36] See an essay, Black, The Penumbra Doctrine and Prohibition Enforcement (1933) 27 Ill.L.Rev. 511, where the author criticizes its application in a series of prohibition cases.