**FRESNO RIFLE AND PISTOL CLUB, INC., et al., Plaintiffs,**

**v.**

**John K. VAN de KAMP, in his official capacity as Attorney General of the State of California, Defendant.**

**No. CV F–90–097 EDP.**

United States District Court, E.D. California.

Sept. 6, 1990.

---

**1416**

Stephen P. Halbrook, Fairfax, Va., and John Dawson, Forrest & McLaughlin, Fresno, Cal., for plaintiffs.

Daniel G. Stone, Deputy Atty. Gen., Sacramento, Cal., for defendant.

Robert C. Vanderet, O'Melveny & Myers, Los Angeles, Cal., and Don B. Kates, Jr., Beneson & Kates, San Francisco, Cal., for amicus curiae.

## MEMORANDUM DECISION RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION TO DISMISS

PRICE, District Judge.

The Roberti–Roos Assault Weapons Control Act became effective in California on January 1, 1990. Neither plaintiffs, defendant, nor any of the amicus curiae provided the Court with a copy of the Act. However, the Act is contained in California Penal Code sections 12275 to 12290.[1] These sections are set forth as Appendix A to this memorandum decision.

### The Parties

Named as plaintiffs are groups of local, state and national organizations described as organizations interested in the use of and competition with firearms, or who are interested in legislation pertaining to the use and possession of firearms.

The individuals named, except "John Doe", are alleged to be members of one or more of the organizations named as plaintiffs.

Springfield Armory, Inc. is a federally licensed manufacturer of firearms; Heckler and Koch, Inc. is a federally licensed importer of firearms.

Each plaintiff alleges that he, she, or it will be irreparably injured by the enforcement of the Act.

John Van de Kamp is the Attorney General of California. Why he is the sole defendant is not explained.[2] It does not

---

1. The Court is informed that the Act was amended effective June 27, 1990. The Court has not considered those amendments in this memorandum decision.

2. It is the constitutional and statutory duty of each district attorney of California to institute criminal proceedings and to cause the arrest of all "persons charged with or reasonably suspected of public offenses." See California Government Code § 26501. The district attorney has the mandatory duty to draw all indictments and

information. See California Government Code § 26502. The Attorney General, on the other hand, directly supervises the district attorneys of the several counties. The relationship of the Attorney General and the several district attorneys of the State was addressed in *People v. Brophy*, 49 Cal.App.2d 15, 18, 120 P.2d 946 (1942). It would not appear that the California Attorney General has any duty, initially, to prosecute individual violations of the act. However, the act does create a unique relationship between him and the firearms manufacturer.

appear that the California Attorney General would initially have any duty to prosecute individual violations of the Act. That duty might arise in supervisory capacity, but is speculative at best. However, California Penal Code section 12276.5 confers special duties upon the State Attorney General concerning the suspension of the manufacture, sale, distribution, or importation into the state of assault weapons.

Plaintiff initiated this action by complaint seeking declaratory relief concerning the Act's validity and an injunction to bar its enforcement. The Attorney General of California filed a motion to dismiss.

The Court will address the several theories set forth in plaintiff's complaint, and the defendants' motion to dismiss.

I. *The Rights Conferred on the Plaintiffs by Amendment II of the United States Constitution.*

The Second Amendment provides:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

In *United States v. Cruikshank,* 92 U.S. 542, 553, 23 L.Ed. 588 (1876), the Supreme Court stated:

The second and tenth counts are equally defective. The right there specified is that of "bearing arms for a lawful purpose." This is not a right granted by the constitution. Neither is it in any manner dependent upon that instrument for its existence. The Second Amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the National Government, leaving the people to look for their protection against any violation of their fellow-citizens of the rights it recognizes, to what is called, in *City of N.Y. v. Miln,* 11 Pet. [102] 139 [9 L.Ed. 648]. the "powers which relate to merely municipal legislation, or what was, perhaps, more properly called internal police," "not surrendered or restrained" by the Constitution of the United States.

All cases that have considered the issues have universally held that the Second Amendment to the United States Constitution expresses a limitation that is applicable to the Congress and the National Government only and has no application to the States.

In *Presser v. Illinois,* 116 U.S. 252, 264–65, 6 S.Ct. 580, 583–84, 29 L.Ed. 615 (1886) the court stated:

We are next to inquire whether the 5th and 6th sections of article XI. of the Military Code are in violation of the other provisions of the constitution of the United States relied on by the plaintiff in error. The first of these is the Second Amendment, which declares: "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."

We think it clear that the sections under consideration, which only forbid bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law, do not infringe the right of the people to keep and bear arms. But a conclusive answer to the contention that this amendment prohibits the legislation in question lies in the fact that the amendment is a limitation only upon the power of Congress and the National government, and not upon that of the States. It was so held by this court in the case of *United States v. Cruikshank,* 92 U.S. 542, 553 [23 L.Ed. 588], in which the Chief Justice, in delivering the judgment of the court, said, that the right of the people to keep and bear arms "is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The Second Amendment declares that it shall not be infringed, but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the National government, leaving the people to look for their protection against any violation by their fellow-citizens of the rights it recognizes to what is

called in *The City of New York v. Miln,* 11 Pet. [102] 139 [9 L.Ed. 648], the 'powers which relate to merely municipal legislation, or what was perhaps more properly called internal police' 'not surrendered or restrained' by the Constitution of the United States."

*See* also, *United States v. Warin,* 530 F.2d 103, 106–07 (6th Cir.1976), *cert. denied* 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185:

It is clear that the Second Amendment guarantees a collective rather than an individual right. In *Stevens v. United States,* 440 F.2d 144, 149 (6th Cir.1971), this court held, in a case challenging the constitutionality of 18 U.S.C.App. § 1202(a)(1):

Since the Second Amendment right "to keep and bear Arms" applies only to the right of the State to maintain a militia and not to the individual's right to bear arms, there can be no serious claim to any express constitutional right of an individual to possess a firearm.

*See also, United States v. Johnson,* 497 F.2d 548, 550 (4th Cir.1974); *United States v. Tot,* 131 F.2d 261, 266 (3d Cir. 1942), *rev'd on other grounds,* 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943).

It is also established that the collective right of the militia is limited to keeping and bearing arms, the possession or use of which "at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, ...." *United States v. Miller, supra,* 307 U.S. [174] at 178, 59 S.Ct. [816] at 818 [83 L.Ed. 1206 (1939)]. *See also, United States v. Johnson, supra; Cody v. United States,* 460 F.2d 34, 37 (8th Cir.), *cert. denied,* 409 U.S. 1010, 93 S.Ct. 454, 34 L.Ed.2d 303 (1972).

The fact that the defendant Warin, in common with all adult residents and citizens of Ohio, is subject to enrollment in the militia of the State confers upon him no right to possess the submachine gun in question. By statute the State of Ohio exempts "members of ... the *organized* militia of this or any other state, ..." (emphasis added) from the provision, "No person shall knowingly acquire, have,

carry, or use any dangerous ordnance." Ohio Revised Code § 2923.17. "Dangerous ordnance" is defined to include any automatic firearm. O.R.C. § 2923.11. There is no such exemption for members of the "sedentary militia." Furthermore, there is absolutely no evidence that a submachine gun in the hands of an individual "sedentary militia" member would have any, much less a "reasonable relationship to the preservation or efficiency of a well regulated militia." *Miller, supra,* 307 U.S. at 178, 59 S.Ct. at 818. Thus we conclude that the defendant has no private right to keep and bear arms under the Second amendment which would bar his prosecution and conviction for violating 26 U.S.C. § 5861(d).

In *Quilici v. Village of Morton Grove,* 695 F.2d 261, 269 (7th Cir.1982), *cert. denied,* 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170, the court stated:

As we have noted, the parties agree that *Presser* is controlling, but disagree as to what *Presser* held. It is difficult to understand how appellants can assert that *Presser* supports the theory that the second amendment right to keep and bear arms is a fundamental right which the state cannot regulate when the *Presser* decision plainly states that "[t]he Second amendment declares that it shall not be infringed, but this ... means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the National government ..." *Presser v. Illinois,* 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615 (1886). As the district court explained in detail, appellants' claim that *Presser* supports the proposition that the second amendment guarantee of the right to keep and bear arms is not subject to state restriction is based on dicta quoted out of context. *Quilici v. Village of Morton Grove,* 532 F.Supp. at 1181–82. This argument borders on the frivolous and does not warrant any further consideration.

Plaintiff relies on the discussion in *United States v. Verdugo–Urquidez,* — U.S. ——, 110 S.Ct. 1056, 108 L.Ed.2d 222, 232–

33 where the court discussed the definition of the phrase "the people" in various parts of the constitution as follows:

That text, by contrast with the Fifth and Sixth Amendments, extends its reach only to "the people." Contrary to the suggestion of amici curiae that the Framers used this phrase "simply to avoid [an] awkward rhetorical redundancy," Brief for American Civil Liberties Union as Amici Curiae et al. 12, n. 4, "the people" seems to have been a term of art employed in select parts of the Constitution. The Preamble declares that the Constitution is ordained and established by "the People of the United States." The Second Amendment protects "the right of the people to keep and bear Arms," and the Ninth and Tenth Amendments provide that certain rights and powers are retained by and reserved to "the people." See also US Const, Amdt 1, ("Congress shall make no law ... abridging ... *the right of the people* peaceably to assemble"); Art I, § 2, cl 1 ("The House of Representatives shall be composed of Members chosen every second Year by the *People of the several States*") (emphasis added). While this textual exegesis is by no means conclusive, it suggests that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community. See *United States ex rel. Turner v. Williams*, 194 US 279, 292, 48 L Ed 979, 24 S Ct 719 [723] (1904) (Excludable alien is not entitled to First Amendment rights, because "[h]e does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law"). The language of these Amendments contrasts with the words "person" and "accused" used in the Fifth and Sixth

Amendments regulating procedure in criminal cases.[3]

The Court accepts that definition of those who are protected from Congress or other parts of the National Government from infringing on their rights to bear arms. The Tenth Amendment to the Constitution provides:

The powers not delegated to the United States Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

Having demonstrated, as we have, that the Second Amendment stays the hand of the National Government only, we conclude that the Constitution has left the question of gun control to the several states. There are no federal constitutional provisions that have been offended by this Act.

II. *The Right of Privacy Guaranteed by the Federal and California Constitutions.*

■ In *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147, 176–77 (1973), the United States Supreme Court ventured cautiously into this area as follows:

The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as *Union Pacific R. Co. v. Botsford*, 141 US 250, 251, 35 L Ed 734, 11 S Ct 1000 [1001] (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the constitution. In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment, *Stanley v. Georgia*, 394 US 557, 564, 22 L Ed 2d 542, 89 S Ct 1243 [1247] (1969); in the Fourth and Fifth Amendments, *Terry v. Ohio*, 392 US 1, 8–9, 20 L Ed 2d 889, 88 S Ct 1868 [1873–74] (1968); *Katz v. United States*, 389 US 347, 350, 19 L Ed 2d 576, 88 S Ct 507 [510] (1967), *Boyd v. United States*, 116 US 616, 29 L Ed 746, 6 S Ct

---

**3.** In the Court's view, this analysis in no way changes the traditional interpretation of the Second Amendment.

524 (1886), see *Olmstead v. United States*, 277 US 438, 478, 72 L Ed 944, 48 S Ct 564, 66 ALR 376 (1928) (Brandeis, J., dissenting); in the penumbras of the Bill of Rights, *Griswold v. Connecticut*, 381 US, [479], at 484–485 [85 S.Ct. 1678, 1681–1682], 14 L Ed 2d 510 in the Ninth Amendment, id., at 486 [85 S.Ct. at 1682], 14 L Ed 2d 510 (Goldberg, J., concurring); or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment, see *Meyer v. Nebraska*, 262 US 390, 399, 67 L Ed 1042, 43 S Ct 625 [626], 29 ALR 1446 (1923). These decisions make it clear that only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 US 319, 325, 82 L Ed 288, 58 S Ct 149 [151] (1937), are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, *Loving v. Virginia*, 388 US 1, 12, 18 L Ed 2d 1010, 87 S Ct 1817 [1823] (1967); procreation; *Skinner v. Oklahoma*, 316 US 535, 541–542, 86 L Ed 1655, 62 S Ct 1110 [1113–1114] (1942); contraception, *Eisenstadt v. Baird*, 405 US, [438], at 453–454 [92 S.Ct. 1029, 1038–1039], 31 L Ed 2d 349; id., at 460, 463–465 [92 S.Ct. at 1041, 1043–1044], 31 L Ed 2d 349 (White, J., concurring in result); family relationships, *Prince v. Massachusetts*, 321 US 158, 166, 88 L Ed 645, 64 S Ct 438 [442] (1944); and child rearing and education, *Pierce v. Society of Sisters*, 268 US 510, 535, 69 L Ed 1070, 45 S Ct 571 [573] 39 ALR 468 (1925), *Meyer v. Nebraska*, supra.

Since that time, it is common knowledge that the concept of a personal right of privacy, as guaranteed by the United States Constitution, has been under attack, not only by the two dissenting Justices who are still on the Court, but by the two Justices since appointed.

A survey of the entry entitled "Privacy" in Volume 11A of U.S. Supreme Court Digest, Lawyers Edition, shows that the concept has never been extended to the private citizen right to possess weapons, or to defend himself and his property. Indeed, the concept has been applied in a myriad of areas, such as the right of a person not to have his name or likeness used without consent, the right to be left alone, freedom of choice in marriage and family life, and so forth.

In Book III, Chapter 1, section 7, Jones, Blackstone—*Commentaries on the Law of England*, the right of self defense is described as follows:

**Self Defense**—The *defense* of one's self, or the mutual and reciprocal defense of such as stand in the relations of husband and wife, parent and child, master and servant. In these cases, if the party himself or any of these his relations, be forcibly attacked in his person or property, it is lawful for him to repel force by force; and the breach of the peace, which happens, is chargeable upon him only who began the affray. For the law, in this case, respects the passions of the human mind; and (when external violence is offered to a man himself, or those to whom he bears a near connection) makes it lawful in him to do himself that immediate justice, to which he is prompted by nature, and which no prudential motives are strong enough to restrain. It considers that the future process of law is by no means an adequate remedy for injuries accompanied with force; since it is impossible to say to what wanton lengths of rapine or cruelty outrages of this sort might be carried, unless it were permitted a man immediately to oppose one violence with another. Self-defense, therefore, as it is justly called the primary law of nature, so it is not, neither can it be in fact, taken away by the law of society. In the English law particularly it is held an excuse for breaches of the peace, may even for homicide itself: but care must be taken that the resistance does not exceed the bounds of mere defense and prevention, for then the defender would himself become an aggressor.

Jones, Blackstone, page 1491 to 1493.

*See* also *N.O. & N.E. Railroad Company v. Jopes*, 142 U.S. 18, 12 S.Ct. 109, 35 L.Ed. 919 (1891).

It is clear from reading these excerpts, as well as older cases, that the modern rule of self-defense, as it presently applies to criminal and civil cases, is not of constitutional origin, but rather comes to us through our inheritance of English common law. Further, these quotations make it clear that the right does not depend upon the existence of certain weapons; indeed, the following standard instructions prepared by Devitt and Blackmar illustrate this:

### Self–Defense—Use of Deadly Force

If the defendant was not the aggressor, and had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant, he had the right to employ deadly force in order to defend himself. By "deadly force" is meant force which is likely to cause death or serious bodily harm.

In order for the defendant to have been justified in the use of deadly force in self-defense, he must not have provoked the assault on him or have been the aggressor. Mere words, without more, do not constitute provocation or aggression.

The circumstances under which he acted must have been such as to produce in the mind of a reasonably prudent person, similarly situated, the reasonable belief that the other person was then about to kill him or to do him serious bodily harm. In addition, the defendant must have actually believed that he was in imminent danger of death or serious bodily harm and that deadly force must be used to repel it.

If evidence of self-defense is present, the Government must prove beyond a reasonable doubt that the defendant did not act in self-defense. If you find that the Government has failed to prove beyond a reasonable doubt that the defendant did not action self-defense, you must find the defendant not guilty. In other words, if you have a reasonable doubt whether or not the defendant acted in self defense, your verdict must be not guilty.

Devitt and Blackmar § 41.19

### Self–Defense—Reasonable Appearances

If the defendant had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, he would be justified in using deadly force in self-defense, even though it may afterwards have turned out that the appearances were false. If these requirements are met he could use deadly force even though there was in fact neither purpose on the part of the other person to kill him or do him serious bodily harm, nor imminent danger that it would be done, nor actual necessity that deadly force be used in self-defense.

Devitt and Blackmar § 41.20

### Self–Defense—No Duty to Retreat

If the defendant had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, he was not required to retreat or to consider whether he could safely retreat. He was entitled to stand his ground and use such force as was reasonably necessary under the circumstances to save his life to protect himself from serious bodily harm.

However, if the defendant could have safely retreated but did not do so, his failure to retreat is a circumstance which you may consider, together with all other circumstances, in determining whether he went farther in repelling the danger, real or apparent, than he was justified in doing under the circumstances.

Devitt and Blackmar, § 41.21

### Self–Defense—Excessive Force

Even if the other person was the aggressor and the defendant was justified in using force in self-defense, he would not be entitled to use any greater force than he had reasonable grounds to believe and actually did believe to be neces-

sary under the circumstances to save his life or avert serious bodily harm.

In determining whether the defendant used excessive force in defending himself, you may consider all the circumstances under which he acted. The claim of self-defense is not necessarily defeated if greater force than would have seemed necessary in cold blood was used by the defendant in the heat of passion generated by an assault upon him. A belief which may be unreasonable in cold blood may be actually and reasonably entertained in the heat of passion.

Devitt and Blackmar, § 41.22

This Court, of course, is bound to follow the California Supreme Court's interpretation of the California Constitution. Counsel has cited no cases that deal with the privacy right guaranteed by Article 1, Section 1, of the California Constitution.[4] The concept of privacy was added to the California Constitution in 1972. A perusal of the cases decided by the California Appellate Courts since that date does not reveal any cases that equate the right to privacy with the right of self-defense, or the right to possess firearms. Until the California Supreme Court so rules, this Court is not willing to do so.

III. *Sections 12276 and 12276.5 of the California Penal Code are "Bills of Attainder."*

■ Section 12276 of the California Penal Code describes 23 named rifles, 7 named pistols and 3 named shotguns as assault weapons. Section 12276.5(a) of the California Penal Code provides that:

Upon request by the Attorney General filed in a verified petition in a superior court of a county with a population of more than 1,000,000, the superior court shall issue a declaration of temporary suspension of the manufacture, sale, distribution, transportation, or importation into the state, or the giving or lending of a firearm alleged to be an assault weapon within the meaning of Section 12276

because the firearm is either of the following:

(1) Another model by the same manufacturer or a copy by another manufacturer of an assault weapon listed in subdivision (a), (b), or (c) of Section 12276 which is identical to one of the assault weapons listed in those subdivisions except for slight modifications or enhancements including, but not limited to: a folding or retractable stock; adjustable sight; case deflector for left-handed shooters; shorter barrel; wooden, plastic or metal stock; larger magazine size; different caliber provided that the caliber exceeds .22 rimfire; or bayonet mount. The court shall strictly construe this paragraph so that a firearm which is merely similar in appearance but not a prototype or copy can not be found to be within the meaning of this paragraph.

(2) A firearm first manufactured or sold to the general public in California after June 1, 1989, which has been redesigned, renamed, or renumbered from one of the firearms listed in subdivision (a), (b) or (c) of Section 12276, or which is manufactured or sold by another company under a licensing agreement to manufacture or sell one of the firearms listed in subdivision (a), (b), or (c) of Section 12276, regardless of the company of production or distribution, or the country of origin.

That section continues to provide that upon a declaration of temporary suspension by the Court, the prohibitory provisions of the California Penal Code apply.

Bills of Attainder have been characterized by the United States Supreme Court in *United States v. Brown*, 381 U.S. 437, 448–49, 85 S.Ct. 1707, 1715, 14 L.Ed.2d 484, 492 (1965) as follows:

"[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the constitution ... This perma-

---

**4.** All people are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing, and protect-ing property; and pursuing and obtaining safety, happiness, and privacy.

Cal Const. Art. 1, § 1

nent proscription from any opportunity to serve the Government is punishment, and of a most severe type.... *See* the collection of cases in 4 L.Ed.2d 2155 *et seq.* As pointed out in the above quotation, the Bill must make identifications of its objects readily identifiable. Arguably, this statute meets that qualification.

However, the second characteristic is that the statute, rather than a court, must specify the punishment, totally omitting any court process of procedure. The statutes under attack do not so provide. First, section 12276.5 of the California Penal Code provides for a court hearing during the proceedings to determine that an unlisted weapon is an assault weapon. Further, any person who is charged with a violation is entitled to all of the rights available to criminal defendants generally.

IV. *The Statutes and Regulations Issued to Administer the Statutes Create Special Privileges and Immunities in the Entertainment Industry.*

This attack is aimed at the face of the statutes and regulations. The plaintiffs' attack is largely based upon plaintiffs' subjective reading of the statutes and the regulations. Plaintiffs argue that only the entertainment industry would qualify under the statutes and regulations. Title 11, Chapter 1, Subchapter 12.5, Article 3, Section 972(c) provides six different situations in which a permit applicant may establish good cause for a permit. The Court finds that the regulations issued provide for a fair, uniform and constitutional application of the permit process. Of course, should there arise an instance where the parties claim that the process is unconstitutionally *applied,* application for relief may be made.

V. *That the Statutes as Written Would Require a Person Who Presently Owns an Assault Weapon to Incriminate Himself or Herself to Obtain a Permit.*

██ California Penal Code Section 12285 provides that any person who lawfully possessed an assault rifle prior to June 1, 1989, shall register the firearm prior to January 1, 1991. A common sense interpretation of the statutes compels one to conclude that the lawful possession of an assault rifle continues to be lawful until the permit is issued, or until January 1, 1991, whichever shall occur first. Further, the statute provides for a permit to be issued to a person who is lawfully in possession of a weapon that is declared to be an assault weapon pursuant to Section 12276.5. The uses to which the permittee may put the weapon are specified.

After segregating persons who were lawful owners of assault weapons as a special class, California Penal Code section 12285 mandated that a registration procedure be set up to accommodate such persons as of May 31, 1985.

Plaintiffs include an Information Bulletin issued by the Division of Law Enforcement, California Department of Justice in an effort to prove that there is no attempt to register legal assault rifles. The document proves the contrary. This bulletin was provided to all California sheriff and police departments to aid them in responding to citizen inquiries. The document indicates that the Department of Justice had already implemented a registration procedure.

As to the information required to obtain registration and the allegation that its requirements cause the declarant to incriminate himself, the case of *United States v. Flores,* 753 F.2d 1499 (9th Cir.1985) is instructive. This case is a rehearing of 729 F.2d 593, in which Flores, who was not a firearms dealer, attempted to ship 22 revolvers to Ecuador by air. He had not notified the airline that he was shipping guns as required by 18 U.S.C. section 922(e). At the district court level, the defendant contended that compliance with the federal statutes under which he was charged would cause him to incriminate himself, hence, the indictment against him was barred by the Fifth Amendment to the United States Constitution. A panel of the Ninth Circuit agreed and dismissed the indictment with prejudice. The government petition for an en banc hearing was granted, and the en banc panel reversed, with three judges dissenting.

In *United States v. Flores*, 753 F.2d 1499, 1503–04 (9th Cir.1985) the en banc panel stated:

> We hold that appellant's Fifth Amendment privilege against self-incrimination was not violated by, and cannot be claimed in connection with, the reporting requirement of 18 U.S.C. § 922(e).

> Although our holding on the Fifth Amendment issue rests upon the balancing of interests just discussed, we are nevertheless stuck by what we see as an absence of improper compulsion in this case. We are convinced this factor is entitled to consideration and lends further support to the conclusion we reach. Appellant may or may not have been guilty of a multitude of collateral crimes by virtue of his attempt to conceal and ship the firearms; however, no one forced appellant to attempt the shipment, and only by so shipping was appellant required to make any disclosure. It is our belief that appellant had reasonable and sensible choices. He could reasonably have chosen not to ship the firearms thereby not invoking the notice requirement and likewise not disclosing any collateral violations of law.

> We recognize that the privilege, as one of the principles of a free government, is intended to shield the guilty as well as the innocent. Justice Stewart wrote that "the basic purpose that lie behind the privilege ... do not relate to protecting the innocent from conviction, but rather to preserving the integrity of a judicial system in which even the guilty are not to be convicted unless the prosecution shoulder the entire load.'" *Tehan v. Shott*, 382 U.S. 406, 415, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966). At the same time, however, there is a difference between using the privilege as a shield against inquisitorial and unfair government practices and using it as a sword to carve a path through the laws of the land. Unfortunately, the line between the two is often less than cristal clear.

> A study of the history of the privilege, in an attempt to clarify its intended scope, is inconclusive. We know that the privilege originally arose in England to combat the *ex officio* oaths used by the ecclesiastical courts whereby people were called, under penalty of death, to answer broad questions before any charges were brought. The privilege evolved over time and was eventually carried, in various forms, to the American colonies. At its inclusion in the Bill of Rights, very little discussion took place. Some commentators have opined that the lack of discussion by the founders was because the privilege was so deeply accepted and taken for granted that it needed no explanation. To be sure, the privilege in the first days of our nation was much more limited than it is today. But, commensurate with the longevity of our entire Constitution, a treatment of the constitutional commands as living institutions has enabled the privilege to be, as Judge Friendly said, "responsive to the particular needs and problems of the time." Throughout the privilege's evolution, however, runs the basic idea that one's constitutional right in this regard is to not be improperly *compelled* to incriminate one's self. At no time has the privilege granted one a right to violate the law.

Coincidental with the passage of this legislation, the Legislature enacted California Penal Code sections 12275.5. This section provides as follows:

> The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state. The Legislature has restricted the assault weapons specified in Section 12276 based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings. It is the intent of the Legislature in enacting this chapter to place restrictions in the use of assault weapons and to establish a registration and permit procedure of their lawful sale and possession. It is not, however, the intent of the Legislature by this chapter to place restrictions on the use of these weapons which are primarily designed

and intended for hunting, target practice, or other legitimate sports or recreations activities.

It is not for the Court to second guess the California Legislature. The Court notes, however, that the application form (Exhibit 16 in Support of a Preliminary Injunction) contains no questions that would necessarily cause the applicant to incriminate himself. As was pointed out in *Flores, supra*, the statute and the regulations must be read in light of the legislative purpose, and the need for the statute balanced against the claimed constitutional right.

VI. *Plaintiffs' Preemption Argument.*

█ Plaintiffs contend that federal legislation in the area preempts the state's right to legislate in this area. To support its argument, plaintiffs point to 10 U.S.C., sections 4307 to 4313 inclusive. These statutes provides as follows:

### Director of civilian marksmanship: detail

The President may detail a commissioned officer of the Army or of the Marine Corps as director of civilian marksmanship, to serve under the direction of the Secretary of the Army.

Title 10 of the United States Code, section 4307

### Civilian rifle ranges: establishment; instruction

(a) The Secretary of the Army, under regulations approved by him upon the recommendation of the National Board for the Promotion of Rifle Practice, shall provide for—

(1) the construction, equipment, maintenance, and operation of indoor and outdoor rife ranges and their accessories and appliances;

(2) the instruction of able-bodied citizens of the United States in marksmanship, and the employment of necessary instructors for that purpose;

(3) the promotion of practice in the use of rifled arms, the maintenance and management of matches or competitions in the use of those arms, and the issue of the arms, ammunition, targets,

and other supplies and appliances, necessary for those purposes;

(4) the award to competitors of trophies, prizes, badges, and other insignia;

(5) the sale to members of the National Rifle Association, at cost, and the issue to clubs organized for practice with rifled arms, under the direction of the National Board for the Promotion of Rifle practice, of the arms, ammunition, targets, and other supplies and appliances necessary for target practice;

(6) the maintenance of the National Board for the Promotion of Rifle Practice, including provision for its necessary expenses and those of it's members;

(7) the procurement of necessary supplies, appliances, trophies, prizes, badges and other insignia, clerical and other services, and labor; and

(8) the transportation of employees, instructors, and civilians to give or receive instruction or to assist or engage in practice in the use of rifled arms, and the transportation and subsistence, or an allowance instead of subsistence, of members of teams authorized by the Secretary to participate in matches or competitions in the use of rifled arms.

(b) There is authorized to be appropriated annually the sum of $7,500 for the incidental expenses of the National Board for the Promotion of Rifle Practice, including books, pamphlets, badges, trophies, prizes, and medals.

Title 10 of the United States Code, section 4308

### Rifle ranges: recommendations to Congress; regulations

(a) The Secretary of the Army shall submit annually to Congress recommendations and estimates for the establishment and maintenance of indoor and outdoor rifle ranges under a plan to provide facilities for rifle practice in all sections of the country.

(b) All rifle ranges established under subsection (a) and all rifle ranges already constructed, in whole or in part with funds provided by the United States, may be used by members of the armed forces and by all able-bodied males capable of bearing arms, under regulations prescribed by the authorities controlling those ranges and approved by the Secretary.

Title 10 of the United States Code, section 4309

### Rifle instruction: detail of members of Army

(a) The President may detail regular or reserve officers and noncommissioned officers of the Army to duty as instructors at rifle ranges for training civilians in the use of military arms.

(b) The Secretary of the Army may detail enlisted members of the Army as temporary instructors in the use of the rifle to organized rifle clubs requesting that instruction.

Title 10 of the United States Code, section 4310

### Rifle instruction: issue of rifles and ammunition

The Secretary of the Army may provide for the issue of a reasonable number of standard military rifles, and such quantities of ammunition as are available, for use in conducting rifle practice at rifle ranges established under section 4309 of this title [10 USCS § 4309] at which instructors have been detailed under section 4310 of this title [10 USCS § 4310].

Title 10 of the United States Code, section 4311

### National rifle and pistol matches: small-arms firing school

(a) An annual competition called the "National Matches" and consisting of rifle and pistol matches for a national trophy, medals, and other prizes shall be held as prescribed by the Secretary of the Army.

(b) The National Matches are open to members of the armed forces, National Guard, Reserve Officers' Training Corps, Air Force Reserve Officers' Training Corps, Citizens' Military Training Camps, Citizens' Air Training Camps, and rifle clubs, and to civilians.

(c) A small arms firing school shall be held in connection with the National Matches.

(d) Competitions for which trophies and medals are provided by the National Rifle Association of America shall be held in connection with the National Matches.

Title 10 of the United States Code, section 4312

### National rifle matches and small-arms school: expenses

(a) Competitors at the National Matches under section 4312 of this title [10 USCS § 4312] may be paid a subsistence allowance in such amount as the Secretary of the Army shall prescribe.

(b) A travel allowance in such amount as the Secretary of the Army shall prescribe may be paid to a civilian competitor instead of traveling expenses and subsistence while traveling, and the allowance for the return trip may be paid in advance.

Title 10 of the United States Code, section 4313

The problem facing this Court is that the only reference to the activities which are carried out by the Director of Civilian Marksmanship is the citation to 32 Code of Federal Regulation, part 543. In all of part 543, there is no mention of the type of weapon to be used. However, the Court notes that in 32 Code of Federal Regulations, part 544, entitled "Civilian Marksmanship", section 544.52 describes the arms to be used as follows:

1. US rifle, caliber .30 M1 as issued by the US Army, or a commercial rifle of the same type and caliber, or either rifle if chambered for 7.62mm.

2. US rifle, caliber 7.62mm M14 or a commercial rifle of the same type and caliber.

3. US rifle, caliber 5.56mm M16 or a commercial rifle of the same type.

4. US pistol .45M 1911 or 1911 A1 or a commercial pistol of the same type.

Based on the Court's limited knowledge of firearms, it does not appear that any of

the legislatively banned weapons in question here qualify as a weapon to be used in the national competition.

This is not to say that the federal program outlined above in 10 U.S.C., section 4307 *et seq.* does not encourage local clubs to become proficient in assault weapons. It is significant, but not controlling, that no federal official or agency was a member of the plaintiffs' group.

Title 18 of the United States Code, section 926A provides as follows:

Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter [18 USCS §§ 921 et seq.] from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: Provided, That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container or other than the glove compartment or console.

Plaintiffs complain that this conflicts with California Penal Code section 12280(a)(1), which states as follows:

Any person who within this state manufactures or causes to be manufactured, distributes, transports, or imports into the state, keeps for sale, or offers or exposes for sale, or who gives or lends any assault weapon, except as provided by this chapter, is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison for four, six, or eight years.

It should be noted that 18 U.S.C. section 926A has two important qualifications; (1) the person transporting the weapon must be entitled, by law, to possess the weapon in the place from which he is transporting it; and (2) be legally entitled to possess it in the place to which it is being transported.

Plaintiffs overlook the fact that when Congress passed these firearm sections in 1968, they also passed 18 U.S.C. section 927 which provides as follows:

No provision of this chapter [18 USCA §§ 921 et seq.] shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any state on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together.

Clearly, 18 U.S.C. section 926A and California Penal Code section 12280(a) can be reconciled.

Plaintiffs' motion for a temporary injunction is denied. Defendants' motion to dismiss the complaint is granted.

## APPENDIX A

### § 12275. Citation of chapter

This chapter shall be known as the Roberti–Roos Assault Weapons Control Act of 1989.
Added Stats 1989 ch 19 sec 3.

*Note*—Stats 1989 ch 19 also provides:
SEC. 4. If any provision of this act or the application thereof to any person or circumstances is held invalid, that invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.
SEC. 5. The Legislature finds and declares that the weapons enumerated in Section 12276 of the Penal Code are particularly dangerous in the hands of criminals and serve no necessary hunting or sporting purpose for honest citizens. It is the intent, therefor, to ban the weapons enumerated in Section 12276 of the Penal Code and any other models which are only variations of these weapons, which are the same weapon but manufactured or sold by another company under a licensing agreement, or which are new models manufactured or sold by any company with just minor modifications or new model numbers in order to circumvent the prohibitions of Chapter 2.3 (commencing with Section 12275) of Title 2 of Part 4 of the Penal Code.

## § 12275.5.  Legislative findings and declarations

The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state.  The Legislature has restricted the assault weapons specified in Section 12276 based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings.  It is the intent of the Legislature in enacting this chapter to place restrictions on the use of assault weapons and to establish a registration and permit procedure for their lawful sale and possession. It is not, however, the intent of the Legislature by this chapter to place restrictions on the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities.

Added Stats 1989 ch 19 sec 3.

*Note*—For severability of provisions, and legislative findings and declarations, see Note following Pen C § 12275.

## § 12276.  "Assault weapon"

As used in this chapter, "assault weapon" shall mean the following firearms known by trade names:

(a)  All of the following specified rifles:
(1)  Avtomat Kalashnikovs (AK) series.
(2)  UZI and Galil.
(3)  Beretta AR–70 (SC–70).
(4)  CETME G3.
(5)  Colt AR–15 series and CAR–15 series.
(6)  Daewoo K–1, K–2, Max 1, and Max 2.
(7)  Fabrique Nationale FN/FAL, FN/LAR, and FNC.
(8)  FAMAS MAS223.
(9)  Heckler & Koch HK–91, H–93, HK–94, and PSG–1.
(10) MAC 10 and MAC 11.
(11) SKS with detachable magazine.
(12) SIG AMT, SIG 500 Series, and SIG PE–57.
(13) Springfield Armory BM59 and SAR–48.
(14) Sterling MK–6 and SAR.
(15) Steyr AUG.
(16) Valmet M62, M71S, and M78.
(17) Armalite AR–180 Carbine.
(18) Bushmaster Assault Rifle (armgun).
(19) Calico M–900 Assault Carbine.
(20) Mandall THE TAC–1 Carbine.
(21) Plainfield Machine Company Carbine.
(22) PJK M–68 Carbine.
(23) Weaver Arm Nighthawk.
(b)  All of the following specified pistols:
(1)  UZI.
(2)  Encom MP–9 and MP–45.
(3)  MAC 10 and MAC 11.
(4)  INTRATEC TEC–9.
(5)  Mitchell Arms Spectre Auto.
(6)  Sterling MK–7.
(7)  Calico M–900.
(c)  All of the following specified shotguns:
(1)  Franchi SPAS 12 and LAW 12.
(2)  Gilbert Equipment Company Striker 12 and SWD Street Sweeper.
(3)  Encom CM–55.
(d)  Any firearm declared by a court pursuant to Section 12276.5 to be an assault weapon.

Added Stats 1989 ch 19 sec 3.

*Note*—For severability of provisions, and legislative findings and declarations, see Note following Pen C § 12275.

**§ 12276.5. Declaration of temporary suspension of manufacture, sale, or impotation; Notice; Hearing on permanent declaration**

(a) Upon request by the Attorney General filed in a verified petition in a superior court of a county with a population of more than 1,000,000, the superior court shall issue a declaration of temporary suspension of the manufacture, sale, distribution, transportation, or importation into the state, or the giving or lending of a firearm alleged to be an assault weapon within the meaning of Section 12276 because the firearm is either of the following:

(1) Another model by the same manufacturer or a copy by another manufacturer of an assault weapon listed in subdivision (a), (b), or (c) of Section 12276 which is identical to one of the assault weapons listed in those subdivisions except for slight modifications or enhancements including, but not limited to: a folding or retractable stock; adjustable sight; case deflector for left-handed shooters; shorter barrel; wooden, plastic or metal stock; larger magazine size; different caliber provided that the caliber exceeds .22 rimfire; or bayonet mount. The court shall strictly construe this paragraph so that a firearm which is merely similar in appearance but not a prototype or copy can not be found to be within the meaning of this paragraph.

(2) A firearm first manufactured or sold to the general public in California after June 1, 1989, which has been redesigned, renamed, or renumbered from one of the firearms listed in subdivision (a), (b), or (c) of Section 12276, or which is manufactured or sold by another company under a licensing agreement to manufacture or sell one of the firearms listed in subdivision (a), (b), or (c) of Section 12276, regardless of the company of production or distribution, or the country of origin.

(b) Upon the issuance of a declaration of temporary suspension by the superior court and after the Attorney General has completed the notice requirements of subdivisions (c) and (d), the provisions of subdivision (a) of Section 12280 shall apply with respect to those weapons.

(c) Upon declaration of temporary suspension, the Attorney General shall immediately notify all police, sheriffs, district attorneys, and those requesting notice pursuant to subdivision (d), shall notify industry and association publications for those who manufacture, sell, or use firearms, and shall publish notice in not less than 10 newspapers of general circulation in geographically diverse sections of the state of the fact that the declaration has been issued.

(d) The Attorney General shall maintain a list of any persons who request to receive notice of any declaration of temporary suspension and shall furnish notice under subdivision (c) to all these persons immediately upon a superior court declaration. Notice shall also be furnished by the Attorney General by certified mail, return receipt requested (or substantial equivalent if the person to receive same resides outside the United States), to any known manufacturer and California distributor of the weapon subject of the temporary suspension order or their California statutory agent for service. The notice shall be deemed effective upon mailing.

(e) After issuing a declaration of temporary suspension under this section, the superior court shall set a date for hearing on a permanent declaration that the weapon is an assault weapon. The hearing shall be set no later than 30 days from the date of issuance of the declaration of temporary suspension. The hearing may be continued for good cause thereafter. Any manufacturer or California distributor of the weapon which is the subject of the temporary suspension order has the right, within 20 days of notification of the issuance of the order, to intervene in the action. Any manufacturer or California distributor who fails to timely exercise its right of intervention, or any other person who manufacturers, sells, or owns the assault weapon may, in the court's discretion, thereafter join the action as amicus curiae.

(f) At the hearing, the burden of proof is upon the Attorney General to show by a preponderance of evidence that the weapon which is the subject of the declaration of temporary suspension is an assault weapon. If the court finds the weapon to be an assault weapon it shall issue a declaration that it is an assault weapon under Section 12276. Any party to the matter may appeal the court's decision. A declaration that the weapon is an assault weapon shall remain in effect during the pendency of the appeal unless ordered otherwise by the appellate court.

Added Stats 1989 ch 19 sec 3.

*Note*—For legislative findings and declarations, and severability, *see* Note following Pen C § 12275.

## § 12277. "Person"

As used in this chapter, "person" means an individual, partnership, corporation, association, or any other group or entity, regardless of how it was created.

Added Stats 1989 ch 19 sec 3.

*Note*—For severability of provisions, and legislative findings and declarations, see Note following Pen C § 12275.

ARTICLE 2

Unlawful Activities

## § 12280. Manufacture, transportation, importation, or sale of weapons; Felony; Punishments; Exceptions

(a)(1) Any person who within this state manufactures or causes to be manufactured, distributes, transports, or imports into the state, keeps for sale, or offers or exposes for sale, or who gives or lends any assault weapon, except as provided by this chapter, is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison for four, six, or eight years.

(2) In addition and consecutive to the punishment imposed under paragraph (1), any person who transfers, lends, sells, or gives any assault weapon to a minor in violation of paragraph (1) shall receive an enhancement of one year.

(b) Except as provided in Section 12288, any person who, within this state, possesses any assault weapon, except as provided in this chapter, is guilty of a public offense and upon conviction shall be punished by imprisonment in the state prison, or in the county jail, not exceeding one year. However, if the person presents proof that he or she lawfully possessed the assault weapon prior to June 1, 1989, or prior to a declaration issued pursuant to Section 12276.5 declaring that firearm to be an assault weapon, and has since either registered the firearm and any other lawfully obtained firearm subject to this chapter pursuant to Section 12285 or relinquished them pursuant to Section 12288, a first-time violation of this subdivision shall be an infraction punishable by a fine of up to five hundred dollars ($500), but not less than three hundred fifty dollars ($350), if the person has otherwise possessed the firearm in compliance with subdivision (c) of Section 12285. In these cases, the firearm shall be returned unless the court finds in the interest of public safety, after notice and hearing, that the assault weapon should be destroyed pursuant to Section 12028.

(c) Notwithstanding Section 654 or any other provision of law, any person who commits another crime while violating this section may receive an additional, consecutive punishment of one year for violating this section in addition and consecutive to the punishment, including enhancements, which is prescribed for the other crime.

(d) Subdivisions (a) and (b) do not apply to the sale to, purchase by, or possession of assault weapons by the Department of Justice, police departments, sheriffs' offices, the Department of Corrections, the California Highway Patrol, the California State Police, district attorneys' offices, or the military or naval forces of this state or of the United States for use in the discharge of their official duties; nor shall anything in this chapter prohibit the possession or use of assault weapons by sworn members of these agencies when on duty and the use is within the scope of their duties.

Added Stats 1989 ch 19 sec 3. Amended Stats 1989 ch 959 sec 1.

*Note*—For severability of provisions, and legislative findings and declarations, see Note following Pen C § 12275.

ARTICLE 3

Registration and Permits

§ 12285. Registration procedure; Fee; Sale or transfer to licensed gun dealer; Conditions for possession; Persons excluded from registration or possession
§ 12286. Permit requirement
§ 12288. Relinquishment of weapon to peace officers

**§ 12285.  Registration procedure; Fee; Sale or transfer to licensed gun dealer; Conditions for possession; Persons excluded from registration or possession**

(a) Any person who lawfully possesses an assault weapon, as defined in Section 12276, prior to June 1, 1989, shall register the firearm by January 1, 1991, with the Department of Justice pursuant to those procedures which the department may establish.  The registration shall contain a description of the firearm that identifies it uniquely, including all identification marks, the full name, address, date of birth, and thumbprint of the owner, and any other information as the department may deem appropriate.  The department may charge a fee for registration of up to twenty dollars ($20) per person but not to exceed the actual processing costs of the department.  After the department establishes fees sufficient to reimburse the department for processing costs, fees charged shall increase at a rate not to exceed the legislatively approved annual cost-of-living adjustment for the department's budget or as otherwise increased through the State Budget Act.

(b) No assault weapon possessed pursuant to this section may be sold or transferred on or after January 1, 1990, to anyone within this state other than to a licensed gun dealer, as defined in subdivision (b) of Section 12290, or as provided in Section 12288.  Any person who (1) obtains title to an assault weapon registered under this section by bequest or intestate succession, (2) moves into the state in lawful possession of an assault weapon, or (3) lawfully possessed a firearm subsequently declared to be an assault weapon pursuant to Section 12276.5, shall, within 90 days, either render the weapon permanently inoperable, sell the weapon to a licensed gun dealer, obtain a permit from the Department of Justice in the same manner as specified in Article 3 (commencing with Section 12230) of Chapter 2, or remove the weapon from this state.  A person who lawfully possessed a firearm which was subsequently declared to be an assault weapon pursuant to Section 12276.5 may alternatively register the firearm within 90 days of the declaration issued pursuant to subdivision (f) of Section 12276.5.

(c) A person who has registered an assault weapon under this section may possess it only under the following conditions unless a permit allowing additional uses is first obtained under Section 12286:

(1) At that person's residence, place of business, or other property owned by that person, or on property owned by another with the owner's express permission.

(2) While on the premises of a target range of a public or private club or organization organized for the purpose of practicing shooting at targets.

(3) While on a target range which holds a regulatory or business license for the purpose of practicing shooting at that target range.

(4) While on the premises of a shooting club which is licensed pursuant to the Fish and Game Code.

(5) While attending any exhibition, display, or educational project which is about firearms and which is sponsored by, conducted under the auspices of, or approved by a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms.

(6) While transporting the assault weapon between any of the places mentioned in this subdivision, if the assault weapon is transported as required by Section 12026.1.

(d) No person who is under the age of 18 years, no person who is prohibited from possessing a firearm by Section 12021 or 12021.1 of this code, and no person described in Section 8100 or 8103 of the Welfare and Institutions Code may register or possess an assault weapon.

(e) The department's registration procedures shall provide the option of joint registration for assault weapons owned by family members residing in the same household.

Added Stats 1989 ch 19 sec 3.

*Note*—For severability of provisions, and legislative findings and declarations, see Note following Pen C § 12275.

**§ 12286.  Permit requirement**

(a) Any person that lawfully acquired an assault weapon before June 1, 1989, and wishes to use it in a manner different than specified in subdivision (c) of Section 12285, any person that lawfully acquired an assault weapon between June 1, 1989, and January 1, 1990, and wishes to keep it after January 1, 1990, or any person who wishes to acquire an assault weapon after January 1, 1990, shall first obtain a permit from the Department of

Justice in the same manner as specified in Article 3 (commencing with Section 12230) of Chapter 2.

Added Stats 1989 ch 19 sec 3.

*Note*—For severability of provisions, and legislative findings and declarations, see Note following Pen C § 12275.

### § 12288. Relinquishment of weapon to peace officers

Any individual may arrange in advance to relinquish an assault weapon to a police or sheriff's department. The assault weapon shall be transported in accordance Section 12026.1.

Added Stats 1989 ch 19 sec 3.

*Note*—For severability, and legislative findings and declarations, see Note following Pen C § 12275.

## ARTICLE 4

### Licensed Gun Dealers

### § 12290. Transportation, display or sale of weapons; "Licensed gun dealer"

(a) Any licensed gun dealer, as defined in subdivision (b), who lawfully possesses an assault weapon pursuant to Section 12285, in addition to the uses allowed in Section 12285, may transport the weapon between dealers or out of the state, display it at any gun show licensed by a state or local governmental entity, sell it to a resident outside the state, or sell it to a person who has been issued a permit pursuant to Section 12286. Any transporting allowed by this section must be done as required by Section 12026.1.

(b) The term "licensed gun dealer," as used in this article means a person who has a federal firearms license, any business license required by a state or local governmental entity, and a seller's permit issued by the State Board of Equalization.

Added Stats 1989 ch 19 sec 3.